# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2013-1332, -1333

LOOPS, LLC and LOOPS FLEXBRUSH LLC,

Plaintiffs-Appellees,

v.

PHOENIX TRADING, INC. (doing business as Amercare Products, Inc.)
and WENDY HEMMING,

Defendants-Appellants,

and

H&L INDUSTRIAL and DOES 1-50, INCLUSIVE,

Defendants,

v.

RICK KLINGBEIL and RICK KLINGBEIL, PC,

Movants-Appellants.

Appeals from the United States District Court for the Western District of
Washington in case no. 08-CV-1064, Judge Ricardo S. Martinez.

**CORRECTED
OPENING BRIEF OF MOVANTS-APPELLANTS
RICK KLINGBEIL AND RICK KLINGBEIL, PC**

Rick Klingbeil
2300 SW First Ave., Ste. 101
Portland, OR  97201
503-473-8565
    Attorney for Rick Klingbeil
    and Rick Klingbeil, PC                    Dated: September 5, 2013

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Loops, LLC                                    v. Phoenix Trading, et al.

No. 13-1332

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
appellant _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Rick Klingbeil and Rick Klingbeil, PC

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Rick Klingbeil, PC
Brooks Cooper, attorney.

_May 2, 2013_
Date

_____
Signature of counsel

_RICK KLINGBEIL_
Printed name of counsel

Please Note: All questions must be answered
cc: Brooks Cooper

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Table of Authorities | 4 |
| II. | Statement of Related Cases | 5 |
| III. | Statement of Jurisdiction | 5 |
| IV. | Questions Presented | 6 |
| V. | Legal Standards | 7 |
| VI. | Statement of the Case | 7 |
| VII. | Statement of Facts | 7 |
| | A.   Incorporation By Reference Pursuant To Fed.R.App.P. 28(i) | 7 |
| | B.   Additional Relevant Facts | 8 |
| | 1.   Klingbeil Advised His Clients To Produce Documents As Required By The Court's Order. Klingbeil Did Not Know Of The Existence Of The TB-FLX And Related Documents Until Loops Filed Its Rule 37 Motion. Klingbeil Did Not Engage In Any Culpable Conduct. | 8 |
| | 2.   Defendant H&L Industries And Its Employee, Mr. Lai Misled Klingbeil And All Other Parties | 10 |
| VIII. | Summary of Argument | 12 |
| IX. | Argument | 14 |
| | A.   Incorporation By Reference Pursuant To Fed.R.App.P. 28(i) | 14 |
| | B.   The District Court Made No Findings Of Fact Relating To Klingbeil's Conduct In This Case.  This Court Should Review The Record And The Sanctions Order Relating To Klingbeil *De Novo*. | 14 |

C.  This Was Not A Situation Where Klingbeil Advised        15
    Amercare Or Hemming To Withhold The TB-FLX Or
    Related Documents. Instead, Klingbeil Diligently
    Sought All Discoverable Documents From Amercare
    And Hemming Throughout This Case, And Was Never
    Told Of The Existence Of The TB-FLX Toothbrush Or
    Related Documents.

D.  The District Court Erred When It Sanctioned Klingbeil    18
    Based On Hemming's Statements About Amercare's
    Price Lists.

E.  The District Court Erred When It Sanctioned Klingbeil    19
    Based On The Conduct Of Defendant H&L Industries
    And Its Employee Mr. Lai.

X.  Conclusion                                               21

XI.  Relief Requested                                        22

A.  Rick Klingbeil and Rick Klingbeil, PC Request This       22
    Court Overturn All Sanctions Imposed Against Them In
    This Case.
B.  Incorporation By Reference Pursuant To Fed.R.App.P.      23
    28(i)

XII.  Proof of Service                                       24

XIII.  Certificate of Compliance                             25

XIV.  Addendum                                               26

Incorporation By Reference Pursuant To Fed.R.App.P. 28(i)    26

Order Granting Plaintiff's Rule 37 Motion to Strike Answer;  AD1
Enter Default Judgment; and Grant Monetary Sanctions
Order on Motion for Default Damages                          AD19

# I.    TABLE OF AUTHORITIES

**CASES**

*Adriana Intern. Corp. v. Thoeren* 913 F.2d 1406 (9th Cir. 1990) ................ 15

*Bonilla v. Volvo Car Corp.*, 150 F.3d 88 (C.A.1, 1998) ....................... 21, 22

*Brock v. El Paso Natural Gas Co.*, 826 F.2d 369 (5th Cir. 1987)............... 15

*Filtron Mfg. Co., Inc. v. Fil-Coil Co., Inc.*, 1980 WL 324469 (E.D.N.Y.,1980)
.............................................................................. 21, 22

*Fonseca v. Sysco Food Services of Arizona, Inc.*. 374 F.3d 840 (9th Cir. 2004)
.............................................................................. 15, 18

*Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694
 (1982) ....................................................................... 18, 20

*United States for the Use and Benefit of Wiltec Guam, Inc. v. Kahaluu
 Construction Co.*, 857 F.2d 600 (9th Cir.1988) ....................................... 15

**STATUTES**

28 U.S.C. § 1295(a)(1) .................................................................. 5

28 U.S.C. § 1338(a) ...................................................................... 5

28 U.S.C.§ 1331 ............................................................................. 5

**RULES**

Fed.R.App.P. 28(i)......................................................... 8, 14, 23

Federal Circuit Rule 47.5............................................................. 5

## II.    STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, sanctioned parties Rick Klingbeil and Rick Klingbeil, P.C. (collectively, "Klingbeil") state that:

(a)    An appeal from the same lower court action is before this Court as case number 2013-1332. That matter is the appeal of sanctioned parties / appellants Phoenix Trading, Inc. dba Amercare and Wendy Hemming. These appeals have been consolidated, with 2013-1332 serving as the lead case, and 2013-1333 (this case) a member case.

(b)    To Appellants' knowledge, there are no other cases pending in this Court or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## III.   STATEMENT OF JURISDICTION

The District Court had jurisdiction pursuant to both 28 U.S.C. § 1338(a) and 28 U.S.C.§ 1331 because the case is an action arising under the patent laws of the United States, and under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) because the case is also an action for trade dress and trademark infringement.

This Court of Appeals has exclusive jurisdiction under 28 U.S.C. § 1295(a)(1) because this is an appeal from a final decision of a district court of

the United States in a civil action arising under an Act of Congress relating to patents. The appeal is from a final order on Plaintiffs' Motion for Default Damages entered by the District Court on March 19, 2013. A timely Notice of Appeal was filed in this case on April 15, 2013. (Case #2013-1333, Dkt. 1).

## IV.   QUESTIONS PRESENTED

1.    Did the District Court err when it sanctioned attorney Rick Klingbeil and Rick Klingbeil, PC ("Klingbeil") based on Amercare's and Hemming's failure to produce documents related to the TB-FLX when Klingbeil instructed his clients throughout this case to produce all documents within their possession, custody, or control related to flexible handled or soft handled toothbrushes, and he did not know or have reason to know of the existence of the TB-FLX or any related documents?

2.    Did the District Court err when it sanctioned Klingbeil based on its finding that Hemming made a false statement about Amercare's pricing list, when Klingbeil had no knowledge about the price lists at issue, or of the truth or falsity of Hemming's statements?

3.    Did the District Court err when it sanctioned Klingbeil based on its finding that Hemming made a false statement about the identity of Amercare's current pricing list, when Klingbeil had no knowledge about the price lists at issue, or of the truth or falsity of Hemming's statements?

4.      Did the District Court err when it sanctioned Klingbeil based on the conduct of defendant H&L and its employee Lai, when Klingbeil did not know about, participate in, or acquiesce to Lai's false statements, but was instead justifiably misled by H&L and Lai?

5.      Did the District Court err when it sanctioned Klingbeil absent any finding that he engaged in any culpable conduct?

6.      Was the severity and amount of the sanction imposed against Klingbeil just and fair under the facts and circumstances and the absence of any finding of culpability?

## V.     LEGAL STANDARDS

Pursuant To Fed.R.App.P. 28(i), appellant Klingbeil incorporates by reference Section V. (Legal Standards) as set forth in the opening brief filed by appellants Phoenix Trading, Inc. dba Amercare ("Amercare") and Wendy Hemming ("Hemming") in this consolidated proceeding.

## VI.     STATEMENT OF THE CASE

Pursuant to Fed.R.App.P. 28(i) appellant Klingbeil incorporates by reference Section VI. (Statement of the Case) as set forth in the opening brief filed by appellants Amercare and Hemming in this consolidated proceeding.

## VII.    STATEMENT OF FACTS

**A.     Incorporation By Reference Pursuant To Fed.R.App.P. 28(i).**

Pursuant to Fed.R.App.P. 28(i) appellant Klingbeil incorporates by reference Section VII. (Statement of Facts) as set forth in the opening brief filed by appellants Amercare and Hemming in this consolidated proceeding.

**B.    Additional Relevant Facts**

Klingbeil briefly re-states facts central to his matter, and includes additional relevant facts as follows.

**1.    Klingbeil Advised His Clients To Produce Documents As Required By The Court's Order.  Klingbeil Did Not Know Or Have Reason To Know Of The Existence Of The TB-FLX And Related Documents Until Loops Filed Its Rule 37 Motion. Klingbeil Did Not Engage In Any Culpable Conduct.**

At all times during this case, Klingbeil instructed Amercare and Hemming to produce all documents requested by Loops that related to the TB-38-S toothbrush. After the Court's Discovery Order, Klingbeil also instructed them to locate and produce all documents in any way related to soft handled or flexible handled toothbrushes.  (AD 150-151; 58-60; 62; 122-123; 146).

Hemming and Siegel considered the TB-FLX a handle-less toothbrush, and it did not occur to either that the toothbrush could be subject to the Court's Discovery Order. (AD 62; 85; 146; 150-151). Further, because there were never any sales of the TB-FLX, it did not appear in the over 2,600 pages of invoices provided to Klingbeil, and then voluntarily provided to Loops.  (AD 86-87; 205-206; 216-223).

The accused TB-38-S toothbrush - which was a soft handled toothbrush - never appeared on any Amercare catalogue or price sheet. (AD 162-177; 279; 114; 147; 152; 154; 156). Because of that, there were no Amercare price sheets that Amercare or Hemming believed to be subject to the District Court's Discovery Order in this case. (AD 34-42; 44; 45-46; 61-63; 146; 150-151; 242-243; 246-247; 224). Instead, Amercare and Hemming believed all of its price sheets fell within the set of documents specifically excluded by the Court's Discovery Order. (*Id.*)

Consequently, Amercare and Hemming produced no price sheets during discovery, and provided no price sheets to Klingbeil. (AD 146; 84-85; 120-123).

Amercare did not provide information related to the TB-FLX to its counsel Klingbeil or his office, or have any discussions with him about it until after Loops filed its Rule 37 Motion. (AD 62; 85; 146; 150-151; 238-241). In short, Klingbeil had never seen, did not know about, and had no reason to know about the TB-FLX toothbrush or any document related to it before Loops filed its Rule 37 Motion. (AD 238).

The District Court made no findings of fact and provided no discussion relating to Klingbeil's conduct or culpability relating to the TB-FLX and documents. (AD 1-18).

### 2.    Defendant H&L Industries And Its Employee, Mr. Lai Misled Klingbeil And All Other Parties.

On March 4, 2010 the District Court ordered Mr. Lai to appear in Seattle, Washington for deposition. (AD 261). Klingbeil immediately began working to obtain Lai's attendance in Seattle. (AD 159-161; 366-368).

Klingbeil contacted Lai, and explained to him that he was required to come to Seattle, and that it was important that he do so. (*Id.*) In connection with this, Klingbeil asked Lai if he had the papers necessary to make the trip. Lai falsely told Klingbeil that he did not have a visa or a passport. (*Id.*) Klingbeil was unaware that Lai was being untruthful, and nothing about the facts or circumstances gave him reason to doubt Lai's statements. (*Id.*)

Klingbeil then instructed Lai to take steps necessary to obtain a visa and passport so he could travel to the United States for his deposition, including suggesting that he contact the Embassy and other actions. When Lai told Klingbeil that he did not want to go to the United States, Klingbeil told him that he had to do so, and he should take immediate steps to obtain a passport and visa. Klingbeil and his office contacted Lai several times to follow up on this issue. (*Id.*)

Concerned about the time it would take for Lai to obtain the necessary paperwork, Klingbeil contacted the United States Department of State, Consular

Affairs division.  He was told that the process would take three months or more. (AD 203-204).

After learning this, on April 26, 2010 Klingbeil filed a Motion with the District Court seeking leave to have Lai's deposition taken over a video conference uplink, with the Defendants paying for the costs necessitated by this alternative process.  (AD 203-204; 369-371).  Loops objected. (*Id.*)

On June 1, 2010 the District Court allowed Lai to be deposed by Plaintiffs  by video-uplink conference at Defendants' expense.  (AD 260-261).

On June 21, 2010, Lai was deposed by videoconference uplink.  At that deposition, he admitted for the first time that he actually had a valid visa and passport. That was entirely new information to Klingbeil, as he at all times reasonably believed what Lai had told him earlier and on several occasions, and had acted on that belief.  (AD 159-161; 366-368). This was also the first time Amercare or Hemming learned that Lai did not have a visa and passport.  (AD 367).

Lai admitted that he intentionally misled Klingbeil and the District Court about his visa and passport status.  He admitted to being an alcoholic, having a fear of air travel, drinking alcohol when he flies to cope with his fears, and suffering bad consequences as a result. (AD 159-161).

## VIII.  SUMMARY OF ARGUMENT

Regardless of whether the TB-FLX toothbrush was or was not a "flexible handled toothbrush" or a "soft handled toothbrush" falling within the District Court's Discovery Order, it was not a toothbrush that was known to Klingbeil at any time before Loops filed its Rule 37 Motion disclosing it.  Klingbeil had diligently sought documents from Amercare and Hemming relating to any flexible handled or soft handled toothbrush throughout this case.

The TB-FLX did not appear in any of the over 2,600 pages of invoices provided to Klingbeil by Amercare.  It was not within any of the sets of exemplars of Amercare toothbrushes provided to him during the case.  Nor was there any discussion or consultation between Klingbeil or any of his clients about the TB-FLX before the Rule 37 motion was filed.  Under these circumstances, it would not be just or fair to sanction Klingbeil for Amercare's and Hemming's non-production of documents related to the TB-FLX.

Klingbeil was similarly unaware of the facts relating to Amercare's price sheets.  Amercare and Hemming never listed the soft handled TB-38-S on any price sheet, and therefore they believed that none of their price sheets were subject to the District Court's Discovery Order.  Accordingly, until the issue arose in connection with Loops' Rule 37 Motion, Klingbeil had no knowledge about whether Amercare's pricing sheets had changed, or which if any price

sheet was its "current" pricing sheet. Klingbeil first saw one price sheet on the day of Hemming's deposition, and did not see or know about the other two price sheets listing the TB-FLX until Loops filed its Rule 37 Motion.

It would not be just or fair to sanction Klingbeil for Amercare's and Hemming's statements about pricing sheets under these circumstances.

Klingbeil's other client, H&L and its employee Lai intentionally (and successfully) misled all parties in this case, including Klingbeil, about Lai's visa and passport status until the day of Lai's deposition. Klingbeil had no reason to doubt Lai's representations. Klingbeil took diligent and reasonable steps that showed he believed and relied on Lai's statements, and that were geared toward fulfilling the District Court's Order that Lai to appear in the United States. Klingbeil discovered the falsity of Lai's statements the same time as Loops, Hemming, and Amercare - at Lai's video-uplink deposition.

It would not be just or fair to sanction Klingbeil under these circumstances.

The District Court made no findings of fact related to Klingbeil's culpability or conduct before imposing sanctions on him. This Court should review the District Court's Order *de novo*.

# IX.   ARGUMENT

## A.    Incorporation By Reference Pursuant To Fed.R.App.P. 28(i).

Pursuant To Fed.R.App.P. 28(i) appellant Klingbeil incorporates by reference the entire argument as set forth in Section IX., Argument in the opening brief filed by appellants Amercare and Wendy Hemming in this consolidated proceeding.  Their briefing and Argument shows that Amercare and Hemming engaged in no sanction-able conduct in this case after the imposition of the adverse instruction sanction by the District Court on March 3, 2010.  If fault can be attributed to Hemming or Amercare, at most they were negligent.

To the extent the sanctions against Klingbeil are derivative of or based on Amercare's and Hemming's conduct, Klingbeil adopts and incorporates their arguments and positions into this briefing and argument.

## B.    The District Court Made No Findings Of Fact Regarding Klingbeil's Conduct In This Matter.  This Court Should Review The Record And The Sanctions Order Relating To Klingbeil *De Novo*.

A District Court's fact-findings are typically reviewed under a clearly erroneous standard. *Brock v. El Paso Natural Gas Co.*, 826 F.2d 369, 372 (5th Cir. 1987).  Where a District Court's decision to impose discovery sanctions was not supported by findings of fact, however, both the legal and factual basis for the sanctions are reviewed *de novo*. *Fonseca v. Sysco Food Services of*

*Arizona, Inc.*. 374 F.3d 840, 845, (9th Cir. 2004). *Adriana Intern. Corp. v. Thoeren* 913 F.2d 1406 (9th Cir. 1990) citing *United States for the Use and Benefit of Wiltec Guam, Inc. v. Kahaluu Construction Co.*, 857 F.2d 600, 603 (9th Cir.1988) (If the district court fails to make factual findings, the decision on a motion for sanctions is reviewed *de novo*.)

The District Court made no factual findings, and did not set forth any discussion or analysis of Klingbeil's conduct before imposing sanctions against him under FRCP 37. (AD 1-18). This Court should, therefore, review this entire matter and each question presented related to Klingbeil *de novo*.

Even if this Court reviews the District Court's rulings under a clearly erroneous standard, it should reach the same result and overturn the sanctions against Klingbeil. The District Court's ruling was clearly erroneous.

**C.    This Was Not A Situation Where Klingbeil Advised Amercare Or Hemming To Withhold The TB-FLX Or Any Related Documents. Instead, Klingbeil Diligently Sought All Discoverable Documents From Amercare And Hemming Throughout This Case, And Was Never Told Of The TB-FLX Toothbrush Or Related Documents.**

This was not a case where Amercare or Hemming consulted with Klingbeil about the TB-FLX and documents at issue, and he then advised them to withhold the documents from production. Instead, Klingbeil instructed his clients throughout this case to locate and provide all documents relating to any flexible handled or soft handled toothbrushes. (AD 15-151; 58-60; 62; 122-

123;146). Even so, he never learned of the TB-FLX and never received any documents related to it until after Loops filed its Rule 37 Motion. (AD 62; 85; 146; 150-151;238-241).

The record also shows this was not a case where Klingbeil ignored his duties, was not available, or otherwise had little contact with his clients regarding their discovery obligations. To the contrary, there was a great deal of discovery interaction in this case between both Klingbeil and his clients, and between Klingbeil and Loops' counsel. This included including ongoing supplemental production, and voluntary production beyond the scope of the District Court's Discovery Order. (AD 86; 123; 138; 206-207; 224).

When a potential issue arose regarding sales of toothbrushes in Iowa, Klingbeil advised his clients to gather and produce exemplars of toothbrushes within their inventory and warehouse, regardless of whether they were subject to the District Court's Discovery Order. This was done to address Loops' concerns about the identity of various models of plastic handled toothbrushes sold in Iowa. (*Id.*) Amercare and Hemming did not have any TB-FLX toothbrushes in its inventory or warehouse, and therefore did not provide any to Klingbeil when he sought these exemplars. (AD 82-83).

On another occasion, Loops expressed concern over other toothbrushes shown in the extensive set of records received from Amercare's import broker.

Although nothing in the District Court's Discovery Orders required it, Klingbeil advised Amercare to gather and produce over 2,600 pages of invoices relating to sales of over 15 million of Amercare's toothbrushes.  This voluntary production required a great deal of time, effort, and expense. (123-124; 205-206; 207; 86; 239). But, it resolved the issue, and moved the case forward.

In short, Klingbeil actively worked on discovery issues in this case, and made numerous attempts to progress the case by directing his clients to disclose documents even beyond those required by the District Court.

Amercare and Hemming never discussed the TB-FLX with Klingbeil and never disclosed it to him because they did not understand it to be a flexible handled or soft handled toothbrush subject to the District Court's Discovery Order. (AD 150-151; 62; 239) Further, the TB-FLX did not appear in the over 2,600 pages of invoices provided to Loops, and did not appear collaterally in any other documents produced in this case[1] because none were ever sold.  (AD 82-87; 122; 137; 205-206; 216-219).

For these reasons, Klingbeil never learned of the TB-FLX, and there was simply nothing he did, or could have done relating to the disclosure or non-disclosure of documents related to it before Loops filed its Rule 37 Motion.

---

[1] For example, documents related to the TB-NS or TB-41-C toothbrushes were included collaterally in production made in this case.  (AD 224; 234-235; 242-247).

There is no evidence of any culpable conduct on the part of Klingbeil anywhere in the record.

Rule 37 requires that "any sanction [imposed pursuant to it] must be 'just.'" *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982). Under the facts, it would not be just or fair to sanction Klingbeil.

**D.    The District Court Committed Error When It Relied Upon Hemming's Statements About Amercare's Price Lists When Deciding To Impose Sanctions On Klingbeil.**

The District Court raised two concerns relating to Hemming's testimony about Amercare's price sheets.  Even so, it made no findings of fact and provided no discussion about any misconduct or culpable behavior by Klingbeil related to that issue.  (ER 1-18). Because of that, this Court should review the Sanctions Order against Klingbeil *de novo. Fonseca v. Sysco Food Services of Arizona, Inc..* 374 F.3d 840, 845, (9th Cir. 2004).

None of the price sheets were ever provided to Klingbeil by Hemming, and the first time he saw the price sheet presented to Hemming as Exhibit 1 to her deposition was at her deposition. (AD 62; 150-152; 239).  Further, Klingbeil had not seen, and did not know of the existence of the price sheets marked Effective 07/07/07 until after Loops filed its Rule 37 Motion.  (*Id*.)

As with the TB-FLX, Amercare and Hemming did not provide its price sheets to Klingbeil for production because they believed that these sheets did not relate to any flexible handled or soft handled toothbrushes subject to production in this case.  To their understanding, the only soft handled or flexible handled toothbrush they had ever sold was the TB-38-S, which was never listed on any price list, or in any catalogue. (AD 162-177; 279; 114; 147; 152; 154; 156).

Regardless of whether Hemming's statements about Amercare's price sheets at her deposition were true or false, there are no facts showing that Klingbeil encouraged, solicited, countenanced, or otherwise caused or allowed Hemming to provide the testimony. Further, because he had no knowledge about any Amercare price sheet, he was unaware of the truth or falsity of Hemming's statements.

Klingbeil did not engage in, counsel, or countenance sanction-able conduct. It would not be fair or just to sanction Klingbeil based in part or whole on this issue.  *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982).

**E.     The District Court Erred When It Imposed Sanctions On Klingbeil Based On The Conduct Of Defendant H&L Industries And Mr. Lai.**

The District Court cited to a "prolonged pattern of misrepresentation and deceit" as a basis for sanctioning Amercare, Hemming, and Klingbeil. The

context of the Order shows this was based in significant part on false statements by Mr. Lai, an employee of defendant H&L Industries related to his visa and passport status. (AD 15).

H&L's and Lai's conduct is in no way justified, and was highly improper. Lai indicated, however, that he intentionally misled the Court, Amercare, Hemming, and H&L's lawyer Klingbeil about his visa and passport status. (AD 159-161). Amercare, Hemming, and Klingbeil had no reason to doubt Lai's representations to them. Because he was a Chinese citizen, there was little that Amercare, Hemming, or Klingbeil could have done to check on his visa and passport status if for any reason they had suspicions.

Further, Klingbeil took substantial actions in reliance on Lai's statements, and to make sure the Court's Order was obeyed. This included pressing Lai to obtain travel documents and seeking ways to obtain expedited travel documents for him. This also included placing calls to the United States State Department, and other research. (AD 159-161; 203-204; 366-368).

There was no finding of fact by the District Court (nor are there any such facts in the record) of any coordination, cooperation, acquiesce, knowledge, or any type of joint misconduct between H&L / Lai with either Klingbeil, his firm, or any other party in this case. Instead, the record strongly supports just

the opposite conclusion. Lai intentionally misled all other participants to this litigation in a convincing manner until he was placed under oath at deposition.

Under the facts, it is unjust, and unfair to impose sanctions against Klingbeil based on Lai's and H&L's misconduct. The District Court committed error when it did so. *Filtron Mfg. Co., Inc. v. Fil-Coil Co., Inc.*, 1980 WL 324469, *1 (E.D.N.Y.,1980); *Bonilla v. Volvo Car Corp.*, 150 F.3d 88, 93 (C.A.1, 1998).

## X.    CONCLUSION

The District Court made no findings of fact concerning any conduct by Klingbeil that would support imposition of sanctions.  A *de novo* review of the record shows that Klingbeil did not engage in any conduct that would support sanctions.

Klingbeil directed his clients to produce documents in accord with the District Court's Discovery Order. He was never told about the TB-FLX by his clients, and had no reason to suspect it was a toothbrush in Amercare's inventory, or that Amercare had ever offered it for sale.

Klingbeil was not provided with any price lists by his clients.  They understood the Court's Discovery Order to exclude documents not related to soft or flexible handled toothbrush similar in design to the TB-38-S or Loops FlexBrush, and therefore did not produce documents that related on to their

plastic-handled, and handle-less toothbrushes.  As a consequence, Klingbeil

did not know whether Hemming's statements were true or false, and did

nothing to cause or countenance her testimony.

After the Court ordered H&L's Mr. Lai to fly to the United States for a

deposition, Klingbeil began working to cause him to appear.  Lai misled

Klingbeil about the status of his visa and passport.  In reliance, Klingbeil

attempted to determine a way to obtain the necessary paperwork in a timely

manner.  When he discovered that would be difficult, he sought a video-uplink

deposition.  It was only at that deposition that Klingbeil discovered that Lai

had misled him, and all the participants to this lawsuit.

Klingbeil had no reason to suspect that Lai was being dishonest, and has

no culpability in the matter.

It was error for the District Court to impose sanctions of over $200,000

jointly on Klingbeil in this case.  The District Court's Order should be

overturned.

## XI.    RELIEF REQUESTED

### A.    Rick Klingbeil and Rick Klingbeil, PC Requests This Court Overturn All Sanctions Imposed Against Them In This Case.

Klingbeil and Klingbeil, PC request that the District Court's Sanction

Orders (AD 1-18 and AD 19-33) against them be overturned in their entirety.

**B.    Incorporation By Reference Pursuant To Fed.R.App.P. 28(i).**

Pursuant to Fed.R.App.P. 28(i) appellant Klingbeil incorporates by reference Section X, (Relief Requested) as set forth in the opening brief filed by appellants Amercare and Hemming in this consolidated proceeding.

Dated: September 5, 2013.                    Respectfully submitted,
                                             RICK KLINGBEIL, PC

                                             /s/ Rick Klingbeil
                                             _____
                                             Rick Klingbeil
                                             *Attorney for Appellants*
                                             Rick Klingbeil, PC and Rick Klingbeil

**Form 30**

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on | Sep 5, 2013 |
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

| Rick Klingbeil | | /s/ Rick Klingbeil |
Name of Counsel | | Signature of Counsel

Law Firm | Rick Klingbeil, PC

Address | 2300 SW First Ave., Suite 101

City, State, ZIP | Portland, OR 97201

Telephone Number | 503-473-8565

FAX Number | 503-427-9001

E-mail Address | rick@klingbeil-law.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

24

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

> The brief contains 3,973 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

> The brief has been prepared in a proportionally spaced typeface using Microsoft Word Mac 2011, Version 14.3.6 in 14 point Times New Roman font.

Dated: Sept. 03, 2013.


/s/ Rick Klingbeil
_____
Rick Klingbeil
Attorney for
Appellants
 Rick Klingbeil and
 Rick Klingbeil, PC

# ADDENDUM

## Incorporation By Reference

Pursuant to Fed.R.App.P. 28(i) appellant Klingbeil incorporates by reference Section XII, (Addendum) as set forth in the Opening Brief filed by appellants Amercare and Hemming in this consolidated proceeding.

## TABLE OF CONTENTS THIS ADDENDUM

### Orders Appealed From

Order Granting Plaintiff's Rule 37 Motion to Strike Answer;          AD 1
Enter Default Judgment; and Grant Monetary Sanctions

Order on Motion for Default Damages                                  AD 19

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LOOPS LLC, a Delaware limited liability company, LOOPS FLEXBRUSH LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>PHOENIX TRADING, INC., dba AMERICARE PRODUCTS, INC., a Washington corporation; WENDY HEMMING, an individual; JEFFREY R. HEMMING, and individual; H&L INDUSTRIAL, a business of unknown formation; and DOES 1 through 50, inclusive,<br><br>Defendant. | CASE NO. C08-1064-RSM<br><br>ORDER GRANTING PLAINTIFFS' RULE 37 MOTION TO STRIKE ANSWER; ENTER DEFAULT JUDGMENT; AND GRANT MONETARY SANCTIONS |

## I. INTRODUCTION

This matter comes before the Court upon Plaintiffs' Rule 37 Motion to Strike Answer; Enter Default Judgment; and Grant Monetary Sanctions (Dkt. #261). For the reasons stated below, Plaintiffs' motion is GRANTED.

ORDER GRANTING PLAINTIFFS' RULE 37 MOTION TO STRIKE ANSWER; ENTER DEFAULT JUDGMENT; AND GRANT MONETARY SANCTIONS - 1

1    ## II. BACKGROUND

2

3    ### A.  The Underlying Lawsuit

4        Plaintiffs Loops, LLC and Loops Flexbrush, LLC (collectively "Loops") allege in this

5    action that Amercare fraudulently obtained a sample of the patented Loops Flexbrush, sent the

6    sample to China to be copied, and sold the infringing copies at a low price, outbidding Loops on

7    a supply contract.  Loops brings claims for patent infringement, violations of the Lanham Act,

8    unfair competition under Washington common law, violations of the Washington Consumer

9    Protection Act, and fraud.

10        Steven Kayser is the inventor of the Loops Flexbrush, a small flexible handle toothbrush

11   designed for safe use in prisons.  The Flexbrush comes in 4.25 inch and 3 inch sizes.  It is made

12   of flexible material, allowing the toothbrush to be bent in half or twisted into a spiral without

13   breaking.  The Flexbrush is well-suited for use in correctional facilities because its soft handle

14   cannot be fashioned into a weapon, known in the vernacular as a shank.  Kayser is the founder of

15   Plaintiffs Loops LLC and Loops Flexbrush LLC and has assigned his relevant intellectual

16   property rights to those companies.  Loops also sells prison-safe dental floss.

17        Amercare is a Washington corporation that imports a wide variety of health and toiletry

18   items such as toothbrushes, shampoo, and soap, and resells them to customers, including prisons.

19   Defendant Wendy Hemming ("Hemming") is the majority shareholder and president of

20   Amercare.  Her husband, Defendant Jeffrey Hemming, was at various times relevant to this

21   lawsuit a minority shareholder, officer, and employee of Amercare.  H&L Industrial is

22   Amercare's manufacturer's representative, located in China.

23

24

ORDER GRANTING PLAINTIFFS' RULE 37 MOTION TO STRIKE ANSWER; ENTER DEFAULT
JUDGMENT; AND GRANT MONETARY SANCTIONS - 2

1   H&L Industrial manufactures foam used for toys, but does not manufacture any other

2   products itself.  Rather, it acts as a broker; when Amercare seeks to import a certain product into

3   the United States, it contacts Mr. Lai at H&L Industrial whose job it is to locate a factory that

4   can produce that product.  H&L Industrial coordinates obtaining the product from a

5   manufacturer, inspecting the product, and arranging with Chinese export agencies to have the

6   product shipped.  Typically Amercare pays H&L a lump sum of money; H&L uses that money to

7   pay the manufacturer and other costs and keeps a 15 to 30 percent commission.

8   On January 13, 2006, Ms. Hemming telephoned Kayser requesting that Loops provide

9   her with price quotations for Loops's dental floss for one of Amercare's clients.  She also

10  requested that Loops provide her with samples of all its products, including the Loops Flexbrush.

11  Loops sent samples of its 4.25 inch toothbrush in the colors blue and white.

12  Approximately two weeks later, Hemming contacted Loops to order dental floss to

13  distribute to her customers.  During the next year, she continued to order floss periodically,

14  placing six orders with Loops between January 26, 2006 and January 23, 2007.

15  In May 2006, Amercare placed a bid with the New York City Department of Corrections

16  ("NYC-DOC") to supply Loops Flexbrush toothbrushes.  The bid sheet Amercare submitted

17  stated that Amercare was the bidder and that it was offering to supply "Loops Flexbrush."  Loops

18  was not aware that Amercare submitted this bid, nor had Loops agreed to sell Amercare its

19  Loops Flexbrush or allow Amercare to distribute it.  Amercare did not win its 2006 bid and

20  consequently never sold any Loops Flexbrushes to NYC-DOC.  Between August 2006 and June

21  2007, NYC-DOC purchased Loops Flexbrushes from Loops.

22  On January 23, 2007, Hemming and Kayser had another telephone conversation.

23  Hemming informed Kayser that she wished to sell the Loops Flexbrush and she would like

24

ORDER GRANTING PLAINTIFFS' RULE 37 MOTION TO STRIKE ANSWER; ENTER DEFAULT
JUDGMENT; AND GRANT MONETARY SANCTIONS - 3

1  Loops to "give" all of its flexible handle toothbrush contracts, including its NYC-DOC contract,

2  to Amercare so that Amercare could be a reseller or distributor of the Loops Flexbrush.  Kayser

3  believed that to allow Amercare to be a reseller would constitute "bid rigging" or "collusion" and

4  refused.  Hemming requested that Loops provide additional samples of the Loops Flexbrush.  On

5  January 26, 2007, Kayser and Hemming met in person at Amercare's offices.  Hemming again

6  requested that Loops allow Amercare to service its contracts and resell its Flexbrush, and Kayser

7  again refused.  In February 2007, Loops sent Amercare additional samples of its Flexbrush

8  toothbrush in response to Amercare's earlier request.

9         Sometime in the early months of 2007, NYC Department of Administrative Services

10  decided to put the NYC-DOC toothbrush contract up for bid.  Loops provided product

11  specification sheets, information regarding the material composition of its toothbrushes, and

12  samples of its Flexbrush to NYC-DOC.  NYC-DOC published bid documents seeking a "Loops

13  Flexbrush # FBM 02 or equal" for the period August 30, 2007 to November 29, 2010.

14         On April 23, 2007, Hemming made one last attempt to convince Kayser to allow

15  Amercare to service Loops's contracts.  Hemming admits that before the meeting began, she

16  intended that if the negotiation failed, she would send the samples of the Loops Flexbrush to

17  China to have them copied and would use those copies to bid against Loops for the NYC-DOC

18  contract.  She did not reveal this intention to Kayser.  Kayser did refuse Hemming's offer, and

19  Hemming carried out her plan.  Immediately following that conversation, Hemming sent samples

20  of the Loops Flexbrush to Mr. Lai in Taiwan to have them copied by a Chinese manufacturer.

21         Hemming was familiar with the price Loops would charge Amercare for Flexbrushes and

22  intended to bid lower than that amount to beat Loops's bid.  According to Hemming, the

23  Flexbrush sample she sent to China was blue, meaning that it was from the batch of samples

24

ORDER GRANTING PLAINTIFFS' RULE 37 MOTION TO STRIKE ANSWER; ENTER DEFAULT
JUDGMENT; AND GRANT MONETARY SANCTIONS - 4

1    provided in 2006. Molds for manufacturing the copied toothbrushes were ordered in May and

2    June 2007.

3         On April 24, 2007, Amercare submitted a bid to NYC-DOC. The bid document stated

4    that Amercare was willing to provide the "Amerfresh Soft Handle = Equal to Loops FBM02"

5    made by "Amercare Products, Inc." The Amerfresh Soft Handle, manufactured in China, is an

6    identical copy of the blue Loops Flexbrush in every respect except one. Whereas the words

7    "LoopS™ Flexbrush™" are embossed in raised lettering on the back side of the head of the

8    Loops Flexbrush (opposite the bristles), the name "AmerCare" is embossed on the Amerfresh

9    toothbrush in the same place and in the same font.

10        Having the lowest bid, Amercare won the contract to provide flexible toothbrushes to

11    NYC-DOC. Amercare's bid was more than 60% lower than Loops's bid. There were no other

12    qualified bidders. Amercare provided NYC-DOC with Amerfresh Soft Handle toothbrushes

13    from October 31, 2007 to May 22, 2008.

14        Loops submitted its patent application for the Loops Flexbrush in August 2004. The

15    patent, number 7,334,286 B2 ("286 patent") did not issue until February 26, 2008. The Loops

16    Flexbrush does not have, and never has had, any markings on the toothbrush itself indicating that

17    it is patented or that a patent is pending. At all times prior to September 2008, the disposable

18    plastic packaging on each individual Flexbrush, including the samples given to Amercare,

19    indicated "patent pending." Flexbrushes with packaging listing the product's patent number did

20    not enter the United States until September 12, 2008. Loops sent Amercare a notice of its

21    pending patent application on November 17, 2007. It did not send Amercare a notice that its

22    patent issued until June 13, 2008.

23

24

ORDER GRANTING PLAINTIFFS' RULE 37 MOTION TO STRIKE ANSWER; ENTER DEFAULT
JUDGMENT; AND GRANT MONETARY SANCTIONS - 5

## B. Procedural History

On February 3, 2009, Plaintiffs served Requests for Production of Documents, Set One. Dkt. #261, Ex. A. The requested documents included all product catalogs and lists for the period of 1/1/06 to the present including paper, web-based or internet product catalogs (RFP#37); all documents related to the sale of soft or flexible handle toothbrushes of approximately 4.25 inches including offers for sale (RFP#24); all documents related to the sale of soft or flexible handle toothbrushes of approximately 4.0-5.0 inches in length, including offers for sale (RFP#25); all documents related to the sale of soft or flexible handle toothbrushes of approximately 3 inches in length, including offers for sale (RFP#26); and all documents related to the sale of soft or flexible handle toothbrushes of approximately 6 inches in length, including offers for sale (RFP#27). In response to these requests, Defendants produced documents on four occasions. One production included a product catalog, which did not include a flexible handle toothbrush. Dkt. #261, Ex. B. Defendants did not produce any price lists.

On August 5, 2009, Plaintiffs filed a Motion to Compel Discovery. Dkt. #59. In ruling on the Motion to Compel, the Court made the following Order:

> [A]ll documents that relate to soft-handled toothbrushes are relevant and must be produced if responsive to a request. It is unclear from the record whether Defendants have ever sold a soft-handled toothbrush other than the Amerfresh Soft Handle toothbrush. To be clear, if they have, those soft-handled toothbrush sales are relevant to this case and are reasonably calculated to lead the discovery of admissible evidence.

Dkt. #69. The Court also held that the particular designation used by Defendants for flexible handle toothbrushes was irrelevant for the purpose of producing documents:

> All flexible handle toothbrushes manufactured or shipped by Defendants are relevant to this case, regardless of the product number used to refer to them. Thus Defendants should not limit their discovery responses to one product number if there are others relating to flexible toothbrushes.

ORDER GRANTING PLAINTIFFS' RULE 37 MOTION TO STRIKE ANSWER; ENTER DEFAULT JUDGMENT; AND GRANT MONETARY SANCTIONS - 6

1    *Id.*  The Court ordered that "[a]ll requests for documents that are constrained to matters

2    relating to flexible handle toothbrushes are proper requests with which Defendants must

3    comply."

4          On November 3, 2009, Plaintiffs took the deposition of Ms. Hemming.  During this

5    deposition, Plaintiffs marked an exhibit that they had independently discovered through a

6    Freedom of Information Act request.  The exhibit was an Amercare product price list, which did

7    not contain any flexible toothbrushes and did not contain a toothbrush denominated "TB-FLX".

8    Dkt. #262, Ex. C.  Ms. Hemming testified that the marked product list was her current price sheet

9    and that she had not changed her price sheet for years.  *Id.,* Ex. D at 31:15-20.

10         On March 3, 2010, the Court granted Plaintiffs' Motion for Contempt of Court Sanctions

11   based on evidence that Amercare had lost, destroyed, or withheld relevant documents regarding

12   its transactions with Chinese entities that were relevant to damages and liability. Dkt. #152.  In

13   doing so, the Court made the following findings:

14         Defendants had four or five invoices from Kai Yuen/ Jiangsu Light within their
           possession or control during the pendency of this litigation. They only produced
15         two of them. Defendants were also in control of purchase orders for flexible
           handle toothbrushes sent from Amercare to H&L Industrial, and invoices from
16         H&L to Amercare, which were not produced. Additionally, Defendants were in
           control of invoices detailing freight charges for transportation of flexible
17         toothbrushes from factories in China to Chinese ports as well as wire transfers
           from Amercare to H&L Industrial, and these have not been produced. The Court
18         finds that Defendants are culpable in either withholding these documents or
           negligently destroying or losing them after having a duty to preserve them. The
19         Court further finds that these materials were relevant to prove the extent of
           Defendants' damages. Finally, the Court finds that some number of e-mails
20         between Amercare and H&L existed during the pendency of this lawsuit which
           were not produced and have since been negligently deleted. These e-mails were
21         likely relevant to damages and liability. Defendants' contention that no
           documents have been destroyed and no more responsive documents exist is
22         directly contradicted by Ms. Hemming's deposition testimony, which indicates
           that relevant documents do or did exist.

23

24

1 | *Id.* at 7. Having made these findings, the Court entered an adverse inference instruction against

2 | Defendants. *Id.*

3 |     In its July 30, 2010 Order on Summary Judgment, this Court determined that

4 | Amercare's last shipment to NYC-DOC occurred before Loops sent Amercare notice on June

5 | 13, 2008 that its patent on the Flexbrush had issued. Dkt. #233. The Court also found that

6 | Flexbrushes with packaging listing the product's patent number did not enter the United States

7 | until September 12, 2008, months after Amercare's last sale to NYC-DOC. *Id.* As a result,

8 | this Court held that Loops was not entitled to any monetary damages from Amercare or

9 | Hemming. *Id.* at 7 ("Since all of Amercare's importation and sales of its Amerfresh Soft

10 | Handle toothbrush occurred on or prior to May 22, 2008, long before the Loops Flexbrush was

11 | properly marked, section 287 bars Loops from recovering infringement damages."). The Court

12 | reached this conclusion based on the evidence before it. Its decision was specifically

13 | predicated on the finding that Amercare had not sold any soft handle toothbrushes after May

14 | 22, 2008. Shortly thereafter, based on the same understanding regarding the date of the last

15 | shipment of Amercare soft handle brushes and the date upon which Amercare was made aware

16 | of Loops' issued patent, the Court dismissed plaintiffs' claims for monetary damages against

17 | H&L Industrial as well. Dkt. #236.

18 |     The discovery cutoff in this case was February 16, 2010. Nonetheless, Plaintiffs

19 | continued to seek evidence of Defendants having sold soft handled toothbrushes after the date

20 | upon which they became aware that a patent had issued to Loops. Accordingly, Plaintiffs sent

21 | Freedom of Information Acts to various correctional institutions. The basis of this motion is

22 | evidence gathered through one such request.

23 |

24 |

ORDER GRANTING PLAINTIFFS' RULE 37 MOTION TO STRIKE ANSWER; ENTER DEFAULT
JUDGMENT; AND GRANT MONETARY SANCTIONS - 8

## C. The Newly Discovered Evidence

In August, 2010, Plaintiffs sent a Freedom of Information Act request for documents to the State of West Virginia.  The request sought vendor catalogs of Amercare products.  Shortly thereafter, the State of West Virginia sent Loops Flexbrush, LLC responsive documents.  The documents revealed that in December, 2009, Defendants provided a Response to a Request for Quotation to the State of West Virginia. The response was personally signed by Wendy Hemming and notarized by Julie Siegel.  Dkt. #262, Ex. F.  It contained two price lists, each including a toothbrush, designated by "TB-FLX," called the "Better Than No-Shank Flexible Toothbrush."   The TB-FLX brushes were offered for sale for 75 cents each.  The price sheet was never produced in discovery, yet the lists themselves contained the marking, "effective date 07/07/07".  Plaintiffs argue that the price sheets show that Defendants have suppressed material evidence throughout the litigation, have filed false declarations based on the suppressed evidence, have successfully been granted summary judgment based on the false declarations, and are seeking attorneys fees based on the false records in this action.  Plaintiffs request the Court strike the pleadings of Defendants, including Defendants' answer and affirmative defenses, and enter judgment in favor of Plaintiffs.

## III. DISCUSSION

Plaintiffs believe that the TB-FLX toothbrush is a flexible handled toothbrush.  If this is true, it may prove that Defendants offered for sale an infringing toothbrush *after* receiving notice from Plaintiffs that a patent had issued on the Loops Flexbrush.  To support their argument that the TB-FLX is a flexible handled toothbrush, Plaintiffs point (1) to the code used to refer to the toothbrush: TB-FLX, or "toothbrush flexible"; (2) the name used to refer to the toothbrush:

1 "Better Than No-Shank Flexible Toothbrush"; and (3) the price of the toothbrush: 75 cents. The

2 75 cent price suggests that the toothbrush is a flexible toothbrush because Wendy Hemming

3 claimed that flexible toothbrushes cost approximately 80 cents. In a declaration submitted by

4 Ms. Hemming in connection with Plaintiffs' 2009 Motion to Compel, she explained the

5 prohibitive price-point of flexible toothbrushes:

> Because the sale price for the Amerfresh Soft Handle Toothbrush (and, almost
> certainly, the Loops Flexbrush) is approximately 20 to 30 times (i.e. 4 cents
> versus 80 cents) that of the disposable toothbrushes sold by Amercare, the
> Flexbrushes are not in much demand throughout the United States.

Dkt. #64-4 at ¶ 7.

9       Defendants contend that the TB-FLX is not a flexible handled toothbrush, but rather, a

10 "fingertip toothbrush" comprised of a "thin, hollow sheath that cover[s] the user's finger" during

11 use. Dkt. #274 at ¶ 7. Defendants explain that the TB-FLX was a second-generation fingertip

12 toothbrush designed to remedy safety concerns associated with the Securitas No-Shank Fingertip

13 Toothbrush, which was known to slip off users' fingers and causes choking hazards. The longer

14 sheath of the TB-FLX was purportedly designed to prevent these choking hazards. Defendants

15 explain that Amercare charged more for this design because it used more materials and was

16 believed to be a better product than the shorter Securitas No-Shank Fingertip Toothbrush

17 product. Dkt. #275 at ¶ 6.

18      Defendants' argument that the TB-*FLX* Better than No-Shank *Flexible* Toothbrush was

19 not a flexible-handled toothbrush is difficult to credit. Defendants offer no explanation for why

20 they would call a toothbrush a "flexible" toothbrush when it in fact did not a have a flexible

21 handle. If the TB-FLX were meant to be a second-generation TB-NS No Shank Fingertip

22 Toothbrush, why was the product not called the "Better Than No Shank *Fingertip* Toothbrush"?

1      In addition, the price of the TB-FLX is suspiciously similar to the price of the Amerfresh

2 product at issue in this lawsuit.   An August 2009 declaration by Ms. Hemming explained that

3 the sales price for flexible handle toothbrushes are 20-30 times the price for normal disposable

4 toothbrushes, i.e., 80 cents compared to 4 cents. Dkt. #64-4 at ¶ 7.  The TB-FLX is listed on the

5 newly-discovered price sheet at a price of 75 cents.  Dkt. #263-2 at 15.  Defendants argue that

6 the high price is due to the fact that more materials were used and because it was a better product

7 than the TB-NS.  However, Defendants do not present any evidence regarding design

8 specifications, the cost of materials, how Defendants acquired the TB-FLX, or any of the dates

9 associated therewith.  Moreover, there are no other toothbrushes on the price sheet that are even

10 close to the 75-80 cent range.  *Id.*  Rather, all of the remaining toothbrushes on the price sheet,

11 except for the "TB-NS No Shank Fingertip Toothbrush," range in price from 4 to 16 cents.  *Id.*

12 The TB-NS is listed at 50 cents – still, only two thirds the price of the TB-FLX.  *Id.*  The Court is

13 inclined to agree with Plaintiffs that it appears that "Defendants have simply taken the highest

14 cost toothbrush on their product price list – the no shank toothbrush offered for 50 cents each –

15 and concocted a story that the TB-FLX is an alternative version of the no shank toothbrush."

16 Dkt. #279 at 7.

17      Plaintiffs argue that the newly-discovered price sheets indicate that declarations filed by

18 Defendants throughout the litigation are knowingly false.   Specifically, Plaintiffs point to the

19 following purportedly false statements:

20    -   Wendy Hemming's September 29, 2009 declaration in support of Defendant's Motion

21       for Summary Judgment in which Ms. Hemming declared "the Amerfresh FHT has only

22       been offered for sale, and only sold to one such customer, the city of New York's

23

24

ORDER GRANTING PLAINTIFFS' RULE 37 MOTION TO STRIKE ANSWER; ENTER DEFAULT
JUDGMENT; AND GRANT MONETARY SANCTIONS - 11

Department of Corrections, through the city's purchasing department, the NY-DCAS."
Dkt. #80 at ¶ 13.

- Wendy Hemming's December 21, 2009 declaration in which she stated she "continued to see if any additional documents were available" and that to her understanding "there are no more documents within Amercare's possession, custody, or control that fall within the court's Order."  Dkt. #129 at ¶ 8.

- Julie Siegel's December 21, 2009 declaration in which Ms. Siegel stated that "all documents and information I discovered during my search that related to the Amercare TB 38-S toothbrush have been provide to Loops in discovery,"  Dkt. #128 at ¶ 6, and "there are no documents within Amercare's possession, custody, or control related to the TB 38-S toothbrushes that have not been previously produced to the plaintiffs in this case," Dkt. #128 at ¶11.

- Wendy Hemming's January 29, 2010 declaration repeating her earlier representation that beyond "the sales to the NY-DCAS, there have been no sales or offers to sell the accused Amercare Amerfresh FHT toothbrush to any other person or customer."  Dkt. #136 at ¶5.

- Wendy Hemming's March 3, 2010 declaration in support of Defendants' motion for summary judgment, wherein Ms. Hemming repeated her earlier representation that "the Amerfresh FHT has only been offered for sale, and only sold to one such customer, the city of New York Department of Correction."  Dkt. #156 at ¶ 10.

Plaintiffs argue that each of these statements are false because they conceal the existence of the July 2007 price lists that identity a flexible handle toothbrush for sale at 75 cents each, conceal

1  the West Virginia bid, and conceal the use of the July 2007 product price lists for other bidding

2  purposes.

3         If the Court could conclusively determine that the TB-FLX was in fact a flexible handled,

4  infringing toothbrush, the Court would agree with Plaintiffs.  Nonetheless, Defendants' tenuous

5  explanation for the discrepancy between its declarations and the West Virginia price sheet does

6  not salvage its reputation before this Court. Even if Defendants' statements about the TB-FLX

7  being a fingertip toothbrush are true, this does not explain why Ms. Hemming testified at her

8  deposition, under oath, that a price sheet that did not include the TB-FLX was her current price

9  sheet and that she had not changed her price sheet "for years."  Dkt. #262, Ex. D at 31:15-20.

10  Ms. Hemming made this statement in November 2009, one month before the newly-discovered

11  price sheet was sent to West Virginia.  The newly-discovered price sheet was marked "effective

12  date 07/07/07."  Thus, the price sheet was in use well before Ms. Hemming's deposition

13  testimony.  Defendants do not offer any explanation for Ms. Hemming's false testimony.

14  Furthermore, both Ms. Hemming and Ms. Siegel have provided declarations in connection with

15  the instant motion in which they concede that multiple versions of the price sheet have always

16  existed.  Dkt. #276 at ¶ 4; Dkt. # 275 at ¶ 4.  Had Ms. Hemming's testimony been truthful at the

17  time of her deposition, this motion would not be before the Court today.

18         In addition, regardless of whether the TB-FLX product is what the Defendants claim it is,

19  Defendants should have disclosed the price sheet to Plaintiffs during the course of discovery.

20  Defendants' failure to do so violated the Court's November 2009 order requiring Defendants to

21  produce "all documents that related to soft-handled toothbrushes."  Dkt. #69.  Defendants argue

22  that the price sheet does not fall within this order because it is considered to be a handle-less

23  design.  Since it has *no* handle, argue Defendants, it does not fall within the Court's order that

24

ORDER GRANTING PLAINTIFFS' RULE 37 MOTION TO STRIKE ANSWER; ENTER DEFAULT
JUDGMENT; AND GRANT MONETARY SANCTIONS - 13

1   Defendants produce all documents related to toothbrushes with soft *handles*.   To support this

2   argument, Defendants point to the patent for the Securitas No-Shank toothbrush, which is

3   entitled "Finger Toothbrush/*Handle-less* Toothbrush."   This justification simply does not excuse

4   Defendants' failure to produce the price sheets.

5         As an initial matter, Defendants' argument that the TB-FLX is actually a toothbrush

6   without a handle is nothing more than semantic somersaulting.  The photograph of what

7   Defendants claim to be the TB-FLX demonstrates a toothbrush device made of transparent

8   material that fits over a user's outstretched finger and extends at least down to the second

9   knuckle of an adult's index finger. Dkt. #276, Ex. B.  In other words, there is a significant

10  portion of the toothbrush that does not have bristles on it and that serves no other purpose that

11  manipulation of the toothbrush – like a handle.  In contrast, a photograph of the Securitas No

12  Shank toothbrush, reveals a toothbrush that fits over the very tip of an adult's finger, which stops

13  short of an adult's first knuckle.  There is no portion of the brush that exists solely for the

14  purpose of manipulation – the hollow of the brush, where a finger may be inserted, is the same

15  part of the brush upon which the bristles are located. Given the significant difference in the

16  extent to which the non-brush portion of these two devices extend down one's finger, the Court

17  cannot accept Defendants' claim that the purported TB-FLX toothbrush does not have a handle

18  simply because the Securitas toothbrush – a completely different toothbrush – does not.

19        More importantly, the November 2009 order did not differentiate between toothbrushes

20  that had a handle, and those that did not.  It differentiated between toothbrushes with flexible

21  handles and those with non-flexible handles.  *See* Dkt. #69.  Thus, in determining whether the

22  TB-FLX fell within the Court's order, Defendants should have considered whether the

23  toothbrush was more like a flexible-handled toothbrush, or a non-flexible handled toothbrush,

24

ORDER GRANTING PLAINTIFFS' RULE 37 MOTION TO STRIKE ANSWER; ENTER DEFAULT
JUDGMENT; AND GRANT MONETARY SANCTIONS - 14

1   not whether the toothbrush could be properly considered to have no handle at all.  *See* Dkt. #69.

2   *See also* Fed. R. Civ. 26(b)(1).  If the TB-FLX is what Defendants claim it to be, the description

3   of the TB-FLX ("TB-FLX – Better Than No-Shank Flexible Toothbrush) indicates that the

4   transparent material seen in the photograph is a flexible material.  Thus, it is evident that the TB-

5   FLX was more like a flexible handle toothbrush than a non-flexible handle toothbrush.  The price

6   list should have been produced.

7       Having found that Defendant Wendy Hemming lied while under oath, that Defendants

8   violated the Court's November 2009 discovery order, and that Defendants may have submitted

9   numerous false declarations in this lawsuit, the Court turns to the question of what is the

10  appropriate sanction.  In making this determination, the Court notes that Defendants have already

11  been found to have lost, destroyed, or withheld material documents, including invoices, purchase

12  orders and emails between Amercare and its Chinese or Taiwanese contracts that were relevant

13  to liability and damages.  *See* Dkt. #152.   In addition, on June 1, 2010, the Court granted

14  Defendants leave to have Mr. Lai appear at deposition for H&L Industrial by videoconference

15  based on Defense counsel's representation that "it appears impossible to obtain the necessary

16  paperwork to bring him to Seattle at this time."  Dkt. #203; Dkt. #193.   In its order granting

17  leave, the Court noted, "Defendants' counsel has investigated the matter and has represented to

18  this Court that acquiring the visa takes a minimum of three months.  The Court will accept

19  counsel's representations."  Dkt. #203 at 2.  However, on June 21, 2010, Mr. Lai testified under

20  oath that he had made no efforts to travel to the United States for his deposition, had within his

21  possession a five-year visa, and could travel to the United States at any time.  Dkt. #215, Ex. A at

22  85-88.  The Court is tremendously concerned with what appears to be a prolonged pattern of

23  misrepresentation and deceit before this Court.

24

ORDER GRANTING PLAINTIFFS' RULE 37 MOTION TO STRIKE ANSWER; ENTER DEFAULT
JUDGMENT; AND GRANT MONETARY SANCTIONS - 15

Federal Rule of Civil Procedure 37 states in pertinent part that, "if a party or a party's officer, director, or managing agent – or a witness designated under Rule 30(b)(6) or 31(a)(4) – fails to obey an order to provide or permit discovery including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37 (b)(2)(A). Such orders may include the following:

*(i)* Directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

*(ii)* Prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

*(iii)* Striking pleadings in whole or in part

*(iv)* Staying further proceedings until the order is obeyed

*(v)* Dismissing the action or proceeding in whole or in part

*(vi)* Rendering a default judgment against the disobedient party; or

*(vii)* Treating as contempt of court the failure to obey any order to submit to a physical or mental examination.

Courts have "considerable discretion to impose the extreme sanction of dismissal or default where there has been flagrant, bad faith disregard of discovery duties." *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990).

Here, the Court has already imposed the sanction of an adverse instruction. *See* Dkt. #152. Apparently, this has done little to promote respect for the integrity of the discovery process. Furthermore, it is unclear how an adverse instruction would now alleviate the damage that has been caused by Defendants' continued failure to cooperate with Plaintiffs in discovery. Partial summary judgment has already been issued in favor of Defendants on the issue of

monetary damages based on evidence – which the Court believed to be complete – that Amercare had not sold or offered for sale flexible handled toothbrushes after May 2008.  The Court is now faced with new evidence that may or may not demonstrate that the partial summary judgment order was made in error.

In any case, the new evidence, combined with the pattern of deception and misrepresentation on the part of Defendants throughout this litigation, indicates that the Court cannot be certain that any order it enters in this case will be supported by the benefit of a full, unadulterated record.  Neither Plaintiffs, nor the Court, will ever "have any comfort that it knows the truth, and that it can properly prepare this case for trial.... The integrity of this Court and our judicial system ... has been undermined … [by Defendants'] conduct in this case." *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1379 (Fed. Cir. 2004).  Accordingly, the Court exercises its discretion pursuant to Rule 37 and hereby strikes the pleadings of Defendants, including Defendants' answer and affirmative defenses, and enters judgment in favor Plaintiffs on the issue of liability.  The Court further sanctions Defendants and counsel for Defendants through an award of attorneys fees and costs in amount to be determined through the submission of declarations.  *See* Fed. R. Civ. P. 37(b)(2)(C).

## IV. CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

1        (1)  Plaintiffs' Rule 37 Motion (Dkt. #261) is GRANTED.  The Clerk of the

2  Court is directed to enter default judgment against Defendants.  All pending motions are stricken

3  from the docket.

4        (2)  The Clerk is directed to forward a copy of this Order to all counsel of record.

6     Dated March 15, 2011.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER GRANTING PLAINTIFFS' RULE 37 MOTION TO STRIKE ANSWER; ENTER DEFAULT
JUDGMENT; AND GRANT MONETARY SANCTIONS - 18

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LOOPS LLC, a Delaware limited liability company, LOOPS FLEXBRUSH LLC, a Delaware limited liability company,<br><br>        Plaintiffs,<br><br>    v.<br><br>PHOENIX TRADING, INC., dba AMERCARE PRODUCTS, INC., a Washington corporation; WENDY HEMMING, an individual; JEFFREY R. HEMMING, an individual; H&L INDUSTRIAL, a business of unknown formation; and DOES 1 through 50, inclusive,<br><br>        Defendants. | CASE NO. C08-1064<br><br>ORDER ON MOTION FOR DEFAULT DAMAGES |

## I. INTRODUCTION

This matter is before the Court on Plaintiffs' (collectively "Loops") motion for default damages. Dkt. # 311. On November 19, 2012, the Court held an evidentiary hearing to determine the proper amount of damages to award Loops pursuant to the Court's Order directing

AD.19

entry of default judgment against Defendants. Dkt. # 287. For the reasons that follow, the Court awards default damages in the amount of $54,718.85 against Defendants and awards attorney fees in the amount of $200,926.00 against Defendants and defense counsel. Plaintiffs shall calculate prejudgment interest and costs as directed below.

## II. BACKGROUND

The facts of this case are familiar to both the Court and the parties. In brief, Loops brought suit in 2008, alleging that Amercare (Phoenix Trading, Inc.) obtained samples of its patented flexible handle toothbrush (hereafter the "Loops Flexbrush"), sent the samples to China to be copied, and offered the infringing copies at lower prices to outbid Loops on a New York City supply contract with the Department of Corrections ("NYC-DOC"). Loops brought claims for patent infringement, Lanham Act violations, unfair competition, Washington Consumer Protection Act violations, and fraud.

The Court addressed the merits of Plaintiffs' claims in its orders granting partial summary judgment for Defendants (Dkt. ## 233, 236). It determined, based on the evidence before it in the summer of 2010, that Defendants prevailed on all claims except patent infringement. However, the Court also determined that Plaintiffs' failure to appropriately mark the product as statutorily required under the patent act precluded recovery of monetary damages for the remaining patent infringement claims. The patent issued on February 26, 2008, but the Court determined that the failure to mark toothbrushes with the patent number delayed notice of the patent until June 13, 2008, the date when Loops sent actual notice to Defendants. Dkt. # 154, p. 6. There was no evidence presented to show that Amercare shipped flexible toothbrushes to the NYC-DOC after it received actual notice of the patent.

Soon after the Court's orders on summary judgment, however, Plaintiffs independently discovered offers for sale—via product price lists—of potentially infringing toothbrushes by Amercare to West Virginia in 2009. Plaintiffs found this information after the formal close of discovery. They brought a motion for sanctions, arguing that Defendants failed to produce relevant discovery in violation of the Court's prior discovery orders and filed false declarations before the Court.

On March 3, 2011, the Court granted Loops' Rule 37 motion for default judgment and struck Defendants' pleadings, including the answer and affirmative defenses (Dkt. # 287). It stated then: "In any case, the new evidence, combined with the pattern of deception and misrepresentation on the part of Defendants throughout this litigation, indicates that the Court cannot be certain that any order it enters in this case will be supported by the benefit of a full unadulterated record." *Id.* at p. 17. The Court granted the motion for default judgment and further sanctioned Defendants and their counsel through an award of attorneys' fees and costs. As the prior Order did not address the amount of damages flowing from the entry of default judgment, the Court now addresses Loops' compensatory damages as well as the amount of attorney fees and costs.

### III. DISCUSSION

**A. Motion for Default Damages**

"While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *Greyhound Exhibitgroup, Inc., v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2nd Cir. 2007). Therefore, a court may not merely "rubber-stamp the non-defaulting party's damages calculation . . . rather, it must ensure

that there is a basis for the damages that are sought." *Overcash v. United Abstract Group, Inc.*, 549 F. Supp. 2d 193, 196 (N.D.N.Y. 2008).

Plaintiffs request damages as follows:

(1) compensatory damages for patent infringement for $5,332,103.00 with enhanced treble damages for a total amount of $15,996,309.00, a permanent injunction, and attorney fees;

(2) damages for violation of the Lanham Act for $1,333,573.00 plus attorney fees;

(3) damages for unfair competition for $1,083,159.00 plus attorney fees;

(4) damages for fraud for $1,083,159.00.

Dkt. # 311, p. 21. Not including attorney fees and costs, Plaintiffs request an award totaling $19,496,200. Defendants contend that while a permanent injunction should issue, no damages should be imposed. Dkt. # 319, pp. 13-14.

The Court previously determined that only the patent infringement claims survived summary judgment for infringement occurring after June 13, 2008. *See* Dkt. ## 233, 236. The Court's prior summary judgment Orders are the law of the case. Accordingly, the Court considered only post-June 13, 2008 evidence of alleged patent infringement to assess default damages. The Court addresses, in turn, Plaintiffs' request for patent infringement damages in the form of lost profits and a reasonable royalty, Plaintiffs' request for treble damages for willful infringement, and Plaintiffs' calculation of attorney fees and costs. As the parties agreed in their moving papers that an injunction should issue against Defendants (Dkt. # 319, p. 8), Plaintiffs' request for a permanent injunction is GRANTED.

1. Patent Infringement Damages

Upon finding infringement, the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court. 35 U.S.C.

§ 284.  The amount of damages is a finding of fact in which the patent owner bears the burden of proof by a preponderance of the evidence.  *Hunter v. Aispuro*, 976 F.2d 1558, 1577 (9th Cir. 1992).  When lost profits cannot be proven, a reasonable royalty serves as a floor on damages. *Armco, Inc. v. Republic Steel Corp.*, 707 F.2d 886, 891 (6th Cir. 1983).

To recover any damages under the lost profits approach, the patent owner must prove (1) that the patent owner would have made the sale of the product but for the infringement; and (2) proper evidence of the computation of lost profits.  *BIC Leisure Products, Inc. v. Windsurfing Intern., Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993); *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 863 (Fed. Cir. 1985).  The critical inquiry is whether the patent owner has shown a reasonable probability that he would have made the infringing sales that the infringer made.  *See Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983). Lost profits may be in the form of diverted sales.  *Id.* at 1064-65.  Where the patent owner and infringer were the only suppliers of the patented product, it is reasonable to infer that the patent owner would have made the sales that were made by the infringer.  *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573 (Fed. Cir. 1989).

Defendants sold copies of the Loops Flexbrush to NYC-DOC after they undercut Loops' contract bid. It is undisputed that Defendants imported and sold 486,336 flexible handled toothbrushes, designated by Amercare as the "TB-38-425-SH-BLUE," (otherwise designated as the "TB-38-S") to supply the NYC-DOC contract. Dkt. # 315, p. 11. Loops contends that but for Defendants' bid on the NYC-DOC contract, Loops would have secured a contract to supply its flexible-handled toothbrush to NYC-DOC through November 2010. Dkt. # 318, p. 19.  Plaintiffs' damages expert determined that between June 13, 2008 and November 2010, the total amount of lost profits would be $460,056.00. Dkt. # 318, p. 37. He calculated this amount based on the

AD.23

anticipated number of toothbrushes NYC-DOC would have ordered to fulfill the supply contract through November 2010, and multiplied that total by the Loops per unit purchase price. He then subtracted manufacturing and shipping costs. The claimed damages, however, are derived from Loops' lost sales at the time Amercare outbid it on the NYC-DOC contract. Amercare obtained the NYC-DOC supply contract in 2007, roughly one year before the patent issued. Because infringement could not occur until after June 13, 2008, Defendants could not supply infringing toothbrushes before that date. Plaintiffs presented no evidence that Defendants sold or shipped infringing products to NYC-DOC after June 18, 2008. Indeed, the last shipment from Amercare to NYC-DOC occurred in May of 2008. Dkt. # 318, p. 38.

Plaintiffs were required to show they would have sold their Flexbrush to NYC-DOC in 2009 and 2010, but for Defendants' sales of the infringing product. But between 2009 and 2010, Plaintiffs' sales could not have been diverted because Defendants no longer supplied the accused product to NYC-DOC. Because Defendants made no shipments to NYC-DOC after May of 2008, Plaintiffs failed to prove lost profits for patent infringement related to the NYC-DOC contract. Accordingly, default damages for patent infringement shall not be awarded on this basis.

Defendants did, however, import 192,672 of the accused product in July of 2008, after receiving actual notice of the patent. *See* Dkt. # 312-4, p. 51.While Plaintiffs cannot show lost profits on mere importation, a reasonable royalty is an appropriate measure of damages to apply. *See Golight, Inc. v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 1175, 1182 (D. Colo. 2002). At the hearing, Defendants conceded the propriety of applying a reasonable royalty to the 192,672 imported toothbrushes. The parties only dispute the rate to be applied. Plaintiffs offer a rate of 28.4 cents per unit of accused product. Dkt. # 318, pp. 21-28. Defendants' contend that a rate

between 2-5% of the Amercare sales price ($0.61) is appropriate, but failed to offer specific information relevant to the product market or otherwise address the *Georgia-Pacific* factors.[1] *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). In contrast, Plaintiffs' expert carefully evaluated the relevant factors in his expert report. Dkt. #

---

[1] The fifteen factors are

    1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

    2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

    3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

    4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

    5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

    6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

    7. The duration of the patent and the term of the license.

    8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

    9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

    10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

    11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

    12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

    13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

    14. The opinion testimony of qualified experts.

    15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pac. Corp.*, 318 F. Supp. at 1120.

318, pp. 21-28. Ultimately, the Court found Defendants' expert not credible in his determination of the appropriate royalty rate because many of the factors favor application of the 28.4 cent royalty rate.

Plaintiffs' expert addressed each factor and the Court agrees that the facts relevant to factors 1-5 and 7-11 support a high royalty rate. First (factor 1), Loops did not grant other entities licenses to use, make, or sell the Loops Flexbrush. Second (factor 2), no evidence of comparable license agreements was offered to the Court to show an industry standard licensing rate. Third (factor 3), while a hypothetical license between Loops and Amercare would have been non-exclusive, the non-exclusivity results from Loops' intent to continue to sell its patented product, not from Loops' intent to license the product to multiple entities. Fourth (factor 4), Loops did not grant a license to a third party and had the capacity to serve the expected demand for its products. Fifth (factor 5), Loops and Amercare are direct competitors. Sixth (factor 7), the patent retained substantial life since it issued in 2008. Seventh (factor 8), the profit margins on both the patented and accused toothbrushes are high. Eighth (factor 9), NY-DOC found the Loops Flexbrush to be a substantial improvement in the market. Ninth (factor 10), Amercare's sales to NY-DOC did not expand the market because Loops would have fulfilled the NY-DOC contract. Last (factor 11), the accused product added no improvements; it was merely an exact copy of the Loops Flexbrush. *See id.* After discussing this information, Loops' damages expert determined that a hypothetical negotiation would have yielded a 28.4 cent royalty rate. He determined that Defendants would still have enjoyed a 38% profit margin, comparable to the 35% price gap it used to undercut Loops' contract bid. *Id.* at 27. Given Defendants vague protests and failure to offer contradictory evidence, the Court finds the higher royalty rate offered by Plaintiffs an appropriate reflection of how the parties valued the Loops Flexbrush.

Accordingly, the 28.4 cents per unit rate applies to the 192,672 infringing units. Thus, the Court awards reasonable royalty damages in the amount of $54,718.85.

Loops also contends that Defendants offered for sale or imported potentially infringing products as follows:

- Oct. 7, 2009 – Defendants, through Pacific Care Products,[2] offered for sale "TB-FLX" toothbrushes to Avenal State Prison in California (Dkt. # 311, p. 6);

- Feb. 3, 2010 – Defendants, through Pacific Care Products, offered a product price list stating: "Other Items We Carry . . . Toothbrushes: Regular, Security, Flexible, Short, etc." to Avenal State Prison, as well as California Substance Abuse Treatment Facility, Central California Women's Facility, and Able Industries (Dkt. # 311, p. 7; Dkt. # 283, p. 9);

- May 28, 2010 – Defendants imported 144,000 "TOOTHBRUSH-38-Soft-C" toothbrushes into the United States (Dkt. # 311, p. 4);

- July 21, 2010 – Defendants bid on a contract with County of Essex, New Jersey for "TB-41-C-GREEN" toothbrushes (Dkt. # 311, p. 4-5).

Defendants presented the Court with the variety of toothbrushes it sells, and provided evidence that the toothbrushes discussed above are different from the infringing copy of the Loops Flexbrush. The TB-FLX, 38-Soft-C, and the TB-41-C-GREEN are distinct in size, shape, and material from the patented product. Despite the plethora of import records and documents gleaned in response to Loops' FOIA requests, Plaintiffs have not demonstrated that these

---

[2] Pacific Care is not a defendant in this case and the parties contest whether Pacific Care's actions are relevant to the default damages motion. *See* Dkt. ## 325-330. The only actual sales of allegedly infringing flexible toothbrushes by Pacific Care were prior to notice of the patent.

toothbrushes are the same as the accused product. *See* Dkt. # 312.[3] Accordingly, the Court does

not find, on the evidence presented, that the toothbrushes indicated above were the infringing

flexible toothbrushes sold to NY-DOC.

## 2. Prejudgment Interest

Prejudgment interest is necessary to ensure that the patent owner is placed in as good a

position as he would have been had the infringer entered into a reasonable royalty agreement,

and thus should ordinarily be awarded absent some justification for withholding the award.

*General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655-56 (1983). Prejudgment interest

applies whether damages are based on lost profits or a reasonable royalty. *Id.* Prejudgment

interest includes not only royalty payments but the patent owner's foregone use of the money,

which runs from the date of infringement to the date of judgment. *Nickson Industries, Inc. v. Rol*

*Mfg. Co., Ltd.*, 847 F.2d 795, 800 (Fed. Cir. 1988). It applies only to primary or actual damages,

and not to punitive or enhanced damages. *Beatrice Foods Co. v. New England Printing &*

*Lithographing Co.,* 923 F.2d 1576 (Fed. Cir. 1991).

The statutory rate or commercial prime rate is an appropriate prejudgment interest rate.

*Lam*, 718 F.2d at 1066. The rate of prejudgment interest and whether it should be compounded

or uncompounded are matters left largely to the discretion of the district court. *Bio-Rad Labs.*,

807 F.2d at 969. Courts are afforded wide latitude in the selection of interest rates and may

award interest at or above the prime rate. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540,

1545 (Fed. Cir. 1991); *see NTP Inc. v. Research in Motion, Ltd.,* 270 F. Supp. 2d 751, 763 (E.D.

---

[3] Loops contends that Defendants imported an additional 1,588,592 infringing toothbrushes between 2006 and 2009. Loops provided the Court with the import records from Airport Brokers Corporation ("ABC"). The records do not show the additional toothbrushes to be infringing. For example, the infringing TB-38-S were packaged with 864 pieces per carton and were priced at $0.055 (before January of 2008) or $0.0605 (after January of 2008) per toothbrush. No other toothbrushes were packaged with 864 pieces per carton, nor were any additional toothbrushes assigned an import price of $0.055 or $.0605. Dkt. # 312-4, pp. 47-51.

Va. 2003) (noting courts have applied various interest rates including the prime rate, corporate bond rates, a consumer credit rate, the rate the patentee paid for borrowed funds and the rate patentee earned on spare funds).

Plaintiffs' damages expert utilized RCW 19.52.010 to determine a prejudgment interest rate of twelve percent per annum. However, RCW 19.52.010 applies to consumer leases and Plaintiffs did not cite the relevant case law concerning prejudgment interest awards for patent infringement. Courts commonly use the prime rate to calculate prejudgment interest for patent infringement. *See, e.g.*, *Uniroyal, Inc. v. RudkinWiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991) (awarding prejudgment interest at prime rate). Therefore, Loops is directed to calculate prejudgment interest on the amount of $54,718.85 from the date of infringement, June 13, 2008, through the date of judgment using the simple, annual prime rate for each year. *See Junker v. HDC Corp.*, No. C-07-05094-JCS, 2008 WL 3385819 at *6 (N.D. Cal. July 28, 2008). (using the prime rate for the years 2004 through 2007 to calculate prejudgment interest).

3. <u>Enhanced Damages</u>

Loops seeks enhanced damages for patent infringement. Under 35 U.S.C. § 284, courts "may increase the damages up to three times the amount found or assessed." When patent infringement is found, enhanced damages may be awarded only as a penalty for an infringer's increased culpability, such as willful infringement or bad faith. *Amsted Industries, Inc., v. Buckeye Steel Castings C.,* 24 F.3d 178 (Fed. Cir. 1994). Damages may not be enhanced beyond a patent owner's actual lost profits or a reasonable royalty absent clear and convincing proof of willfulness and exceptionality. Moreover, a finding of willful infringement authorizes, but does not mandate an award of enhanced damages. *Modine Mfg. Co. v. Allen Group, Inc.,* 917 F.2d 538, 542-43 (Fed. Cir. 1990).

Whether and to what extent damages should be increased is within the court's sound discretion. *Jurgens v. CBK Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996). The court may consider the following factors in making this assessment:

> (1) whether the infringer deliberately copied the ideas or design of another, (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, (3) the infringer's behavior as a party to the litigation, (4) the infringer's size and financial condition, (5) the closeness of the case, (6) the duration of the infringer's misconduct, (7) any remedial action by the infringer, (8) the infringer's motivation for harm, and (9) whether the infringer attempted to conceal its misconduct.

*Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1352 n. 16 (Fed. Cir. 1998).

Here, Loops requests treble damages for willful infringement based on Defendants' non-compliance with court proceedings as well as the alleged importation of flexible toothbrushes after the Court issued its contempt order. Dkt. # 311, p. 15. Without having reached the merits of the infringement claim, however, clear and convincing proof of willful infringement cannot be found. Further, the Court sanctioned Defendants for their behavior as parties to the litigation by striking the pleadings, entering default judgment, and awarding Plaintiffs' attorney fees and costs. Accordingly, the Court declines to award enhanced damages as it has already imposed a severe sanction against Defendants.

### 4. Attorney Fees

The Court previously awarded Plaintiffs' attorney fees and costs, but did not calculate the total amount. Dkt # 287, p. 17. To calculate a reasonable award of attorney fees as a Rule 37 sanction, courts use the lodestar approach. *See Dang v. Cross*, 422 F.3d 800, 812 (9th Cir. 2005). The lodestar amount results from "multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

For the lodestar amount to be reasonable, both the hours claimed and the hourly rate must be reasonable. *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986).  Upon factoring in the novelty of the legal issue, skill and experience of the attorney, and other variables that may affect the hours or rate, the lodestar amount is presumptively reasonable and any upward or downward adjustment is appropriate only in exceptional cases where the amount is "unreasonably low or unreasonably high."  *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000).

Although Plaintiffs originally requested attorney fees in the amount of $163,185.00 (Dkt. # 290), Plaintiffs now request a judgment of attorney fees in the amount of $483,667.31 for all fees incurred in the case.  Dkt. # 343, p. 2. Fees awarded under Rule 37 are limited to fees related to abuse of the discovery process. *Stillman v. Edmund Scientific Co.*, 522 F.2d 798, 801 (4th Cir. 1975) ("Rule 37 deals with the consequences of the failure to make discovery, and authorizes the imposition of sanctions in cases in which there has been an abuse of the discovery rules."). Since "the sanctions authorized under the Rule must pertain to the discovery process, no assessment may be made for expenses which were incurred independent of that process." *Id.* Thus, the Court will not award Plaintiffs the entirety of the fees incurred throughout this litigation. Fees shall be limited to fees incurred in taking the November 2009 depositions of Hemming and Siegel, for opposing Defendants' motion for summary judgment, for bringing the motion for contempt, for taking the deposition of H&L Industrial, for beginning trial preparation, for opposing Defendants' motion for attorney fees, for bringing the Rule 37 motion for sanctions, and for bringing the motion for default damages as described in Dkt. ## 289, 290. This amount totals $163,101.00. Specifically, Mr. Steele billed 354.66 hours at a rate of $350 per hour and 5.5 hours at a rate of $150 per hour for a total fee of $124,956.00. Local counsel, Lee Smart, P.S., Inc.,

billed 183.6 hours at a rate of $200 per hour and 5.7 hours at a rate of $250 per hour for a total

fee of $38,145.00. Each attorney submitted a declaration showing that the fees charged are

reasonable. *See* Dkt. ## 289, 290. Additional fees incurred in bringing the default damages

motion, which total $37,825.00 (not including costs), shall be awarded (Dkt. # 343). Defendants

do not object to Plaintiffs' lodestar calculations for the fees cited. The Court finds the fees

reasonable given the hours incurred and the rates charged by each attorney. *See* Dkt. ## 289, 290,

343. It therefore awards attorney fees in the amount of $200,926.00.

5. <u>Costs</u>

"The costs that may be awarded to prevailing parties in lawsuits brought in federal court

are set forth in 28 U.S.C. § 1920." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 1999-

2000, 182 L. Ed. 2d 903 (2012). Section 1920 contains six categories of taxable costs: (1) "[f]ees

of the clerk and marshal"; (2) "[f]ees of the court reporter for all or any part of the stenographic

transcript necessarily obtained for use in the case"; (3) "[f]ees and disbursements for printing and

witnesses"; (4) "[f]ees for exemplification and copies of papers necessarily obtained for use in

the case"; and (5) "[d]ocket fees under section 1923 of this title"; and (6) "[c]ompensation of

court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of

special interpretation services under section 1828 of this title." 28 U.S.C. § 1920. Mr. Kayser's

declaration detailing Plaintiffs' "costs," does not provide a sufficient basis for the Court to award

costs. For example, Plaintiffs list as "costs" Mr. Kayser's (the principle of Loops) personal

mileage rates, hotel reservations, flights, and food and drink expenses apparently incurred during

his involvement in this litigation. Dkt. # 291-1. "Expenses" are not the same as "costs." *Hairline*

*Creations, Inc. v. Kefalas*, 664 F.2d 652, 655 (7th Cir. 1981). Accordingly, Plaintiffs are directed

to provide the Court with a list of costs that are recoverable under 28 U.S.C. § 1920. Plaintiffs shall not recover additional fees or costs for time spent complying with this Order.

## IV. CONCLUSION

Having reviewed the motion, the response and reply thereto, the attached exhibits and declarations, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Plaintiffs shall be awarded $54,718.85 in default damages against Defendants with prejudgment interest to be calculated and submitted to the Court as discussed above.

(2) Plaintiffs shall be awarded $200,926.00 against Defendants and defense counsel for attorney fees.

(3) Plaintiffs are directed to submit a bill of recoverable costs.

(4) The Clerk is directed to send copies of this Order to all counsel of record.

Dated March 19, 2013.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

**Form 30**

FORM 30. Certificate of Service

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on | Sep 5, 2013 |
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
    (by email or CM/ECF)

| Rick Klingbeil | | /s/ Rick Klingbeil |

Name of Counsel            Signature of Counsel

Law Firm | Rick Klingbeil, PC |

Address | 2300 SW First Ave., Suite 101 |

City, State, ZIP | Portland, OR 97201 |

Telephone Number | 503-473-8565 |

FAX Number | 503-427-9001 |

E-mail Address | rick@klingbeil-law.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.